Before TODD, Circuit Justice, and McNAIRY, District Judge.

TODD, Circuit Justice. His interest cannot be proved in this way. It would be nothing more than hearsay evidence, which shall not affect the plaintiff. You may prove him incompetent from acts, or from facts that are capable of being seen and judged of; but you cannot show his interest by anything he has said. It might be that he would say a thing of that kind barely to prevent a party from having the benefit of his testimony.

McNAIRY, District Judge, said he was not perfectly satisfied with the opinion of his Brother TODD. The objection to the introduction of the witness upon a division of the court would fail; it was, therefore, unnecessary for him to give any opinion upon the subject, but he said it would seem strange, at first view, that if a witness should say that he was to have five hundred dollars of the income to be recovered by the plaintiff, this should not render him incompetent. The acts and facts spoken of may exist only in the knowledge of the witnesses and the party.

Declarations of a witness as to his interest are not admissible to prove his incompetency to testify. See Erickson v. Bell, 53 Iowa, 631, 6 N. W. 19, citing case in text.

---

VINSENT (UNITED STATES v.). See Case No. 16,623.

---

## Case No. 16,950.

VINT v. KING et al. FINDLAY v. VINT et al. ALLEN v. VINT et al. SHEFFEY v. VINT et al.

[2 Am. Law Reg. 712.]

District Court, W. D. Virginia. 1853.

CONSTRUCTION OF WILL — LEGAL AND EQUITABLE ESTATE — CONDITION SUBSEQUENT — RESULTING TRUST—ALIENAGE AND NATURALIZATION—ABEYANCE — BILLS OF PARTITION — FRAUD — INADEQUACY OF CONSIDERATION—RECITALS IN A DEED —RECEIPT PRIMA FACIE EVIDENCE — ANSWER, WHEN EVIDENCE — ISSUE OUT OF CHANCERY — LACHES — CREDITOR AT LARGE—ASSIGNOR AND ASSIGNEE.

1. A will contained the following clause: "In case of having no children, I then leave and bequeath all my real estate, at the death of my wife, to W. K. son of brother J. K., on condition of his marrying a daughter of W. T. and my niece R. T. in trust for the eldest son or issue of such marriage." W. T. and his wife both died without having had a daughter born to them, whereby the performance of the condition on which W. K. took the estate, became impossible. Held by the supreme court of the United States: (1) That this clause vested in W. K. the legal estate in fee simple, on a condition subsequent. Findlay v. King's Lessee, 3 Pet. [28 U. S.] 346. (2) But W. K. took no beneficial estate in fee, but an estate in trust for his issues, springing from his intermarriage with the unborn daughter of a husband and wife, both of whom died without the birth of a daughter, and that the trust having failed, there remained a resulting trust to the heirs at law of the testator, who were en-

titled to partition. King v. Mitchell, 8 Pet. [33 U. S.] 326.

[Cited in Benter v. Patch. 18 D. C. 592.]

2. The next of kin of the testator were three brothers and sisters of the whole blood, and a brother and sister of the half blood. These last, by the law of descents of Virginia, were entitled to half portions. This half brother and half sister were born in Ireland, and were never naturalized by any act of their own. But their father, also an Irishman by birth, was naturalized under the law of Virginia, in 1787. The two children last referred to were then minors, living in Ireland, came to Virginia in 1792, and resided there until after 1802, when an act of congress was passed declaring that the children of persons duly naturalized under any of the laws of the United States, or who, previous to the passage of any law on that subject by the government of the United States, may have become citizens of any one of the said states, under the laws thereof, being under the age of twenty-one years, at the time of their parents being so naturalized, shall, if dwelling in the United States, be considered as citizens of the United States. These children were naturalized by virtue of this act of congress, and so capable of acquiring title to real estate by descent.

3. The resulting trust remaining in the heirs at law of the testator was not a mere possibility, incapable of being granted, assigned or devised, but an equitable estate perfectly capable of such transfer. This resulting trust, the creature of equity, had its existence at the moment of the testator's death. It descended to his heirs at law, subject to be divested whenever the express trust created by the will became vested, and did not remain in abeyance, until the condition on which the express trust was to vest, became impossible. Therefore, from the moment of the testator's death, his heirs at law, had a defeasible and conditional estate cast upon them by the law, which they might as effectually alien as if it had been indefeasible and unconditional, and legal as well as equitable.

4. In limitations of legal estates where a remainder of inheritance is limited in contingency, by way of use or by devise, the inheritance in the meantime, if not otherwise disposed of, remains in the grantor and his heirs, or in the heirs of the testator, until the contingency happens to take it out of them. An equity herein follows the law.

5. Ordinarily, an application to a court of equity for partition is not an appeal to the sound discretion of the court, to be granted or refused according to the circumstances of the case, as in cases of specific execution and other cases, but the right to demand partition is ex debito justitiæ if the complainant can show a clear legal title.

6. The bill for partition is a substitute for the now obsolete remedy by writ of partition in the law courts, and courts of equity, in their proceedings on these bills as in other cases of concurrent jurisdiction, give the same relief that was formerly afforded in the courts of law by writ of partition. Questions of fraud were not cognizable in these latter tribunals where a party brought his writ of partition, and the same rule obtains in equity courts whenever the plaintiff had his election to proceed either at law or in equity. But where complainant in equity stands upon a purely equitable title, of which courts of law will not take cognizance at all, the jurisdiction of equity is exclusive, and courts of equity are left free to adopt our cherished principles, and to apply their power to detect and eviscerate latent frauds and concealments which the process of a court of law is not adapted to reach, and to relieve against them.

7. It seems, that even where a plaintiff in equity seeking partition, shows a clear legal title, if the defendant files a cross-bill alleging fraud in the procurement of his conveyance by the plain-

tiff in the original bill, who, instead of demurring to the cross-bill, answers and denies the fraud, and depositions are taken on each side to establish and repel the imputation of fraud respectively, it is too late at the trial, for the original plaintiff, to object that equity has no jurisdiction to examine questions of fraud on bills for partition. The cross-bill, filed by the defendant against a plaintiff is, to some extent, a substitute for an independent and original bill: and as, after a decree for partition in favor of a plaintiff showing a clear legal title, the defendant would doubtless be entitled to relief in equity by a new bill impeaching the plaintiff's title, on the ground of fraud, no reason is perceived why the same measure of relief should not be applied in favor of the plaintiff in the cross-bill, the defendant having waived his right to object to the jurisdiction of equity to take cognizance of questions of fraud in such cases. Fraud is never presumed by the law: it must always be proved, and the onus is upon the party alleging it.

8. The power of courts of equity to set aside and annul executed contracts on the ground of inadequacy of consideration, is a most delicate one, and should be applied with extreme caution. Mere inadequacy of consideration is not to be understood in equity as constituting per se. a ground to avoid a contract, unless it be so gross as to shock the conscience. In such cases, it is evidence per se, sufficient to avoid it. But where the contract is o e of hazard, and the question whether it will be profitable or ruinous is dependent on future contingencies, the issue of which no human foresight can discover, the court has no satisfactory standard by which to determine whether the price was inadequate or no, much less, whether the inadequacy was so gross as to constitute per se evidence of fraud: and it should refuse to interfere with the legal operation of the contract.

9. Quære, whether the recitals of a deed executed by a grantor to a grantee, tending to show the execution of a former deed by the same grantor to another grantee, estop the grantor and those claiming under him from denying the fact of the execution of such deed? This question cannot be determined unless the party claiming a benefit under such deed, puts the fact of its execution distinctly in issue by bringing his bill to set it up as a lost deed, averring its execution and loss.

10. A bill for specific execution of a contract is not entertained in equity as a matter of right, but is addressed to the sound discretion of the court. Case in which in the exercise of this judicial discretion, the prayer for specific execution was denied.

11. In ordinary cases the nonpayment of money by a stipulated day is not sufficient of itself to defeat the claim of a party to specific execution, since interest will usually compensate the party for the delay, and equity relieves from forfeitures whenever it can make compensation. But when parties enter into an executory contract of sale whereby it is stipulated, that if the vendor did not pay the purchase money within a prescribed period, the contract should be null and void, they have chosen to make time of the essence of their contract in express terms, and even partial payments made within the period will not entitle the vendor to demand a decree for specific execution. To decree specific execution, under such circumstances, would in truth be, not the enforcement of the contract between the parties. but the assumption of authority by a court of equity to make a contract for the parties which they had not made for themselves. The court should treat the contract as rescinded and require the vendor to refund so much of the purchase money as has been paid by the vendee. Especially should specific execution be refused when the bill was brought after a great lapse of time which wrought great changes in the relations of the parties and in the subject of the contract.

12. A receipt is prima facie evidence that the sum of money expressed in it, was paid according to its tenor.

13. A bill is brought for specific execution of a contract of sale of real estate between the ancestor of the plaintiffs and the defendant: a written contract of sale, between the parties and a receipt executed by the vendor to the vendee, acknowledging the payment of a large portion of the purchase money are produced by the plaintiffs and filed as exhibits with their bill: no discovery is sought by the bill of the genuineness of the contract and receipt, or of the fact whether the money was paid or not: the answer admits the execution of both by the defendant, but denies that the money was in fact paid, as stated in the receipt, and other evidence exists in the cause tending to show that the money was not paid: Held: (1) That the answer not being responsive to the bill, was not evidence that could avail the respondent. (2) That as there was other evidence in the cause tending to repel the presumption of payment arising from the execution of the receipt, it was proper to direct an issue to be tried by a jury, to determine whether the money had been in truth paid or no?

14. A mere creditor at large will not be entertained in equity, to enable him to reach the equitable estate of his debtor. He must obtain a judgment at law, binding the real estate of his debtor, before he can come into equity. The judgment lien is the necessary foundation for the equitable jurisdiction, and equity lends its aid to make that lien effectual whenever it cannot be enforced by execution at law.

15. The relation of assignor and assignee of a chose in action examined and discussed.

[This was a bill in equity by John Vint against the heirs of Samuel King and of John Allen and Hannah, his wife, and others; also, three cross bills, brought, respectively, by Alexander Findley, Hannah Allen's heirs, and Daniel Sheffey's administrator and heirs, against John Vint and others.]

James W. Sheffey and A. H. H. Stuart, for complainant in the original bill and the representatives of Daniel Sheffey.

Beverly R. Johnston, B. Rush Floyd, and Mr. Leftwick, for Alexander Findlay and the heirs of Hannah Allen.

Thomas J. Mickie, on behalf of the representatives of Daniel Sheffey.

BROCKENBROUGH, Circuit Justice. William King died in October, 1808, seised and possessed of an immense real and personal estate. His will contains the following clause: "In case of having no children, I then leave and bequeath all my real estate, at the death of my wife, to William King, son of brother James King, on condition of his marrying a daughter of William Trigg, and my niece Rachel, his wife, late Rachel Findlay, in trust for the eldest son or issue of such marriage; and in case such marriage should not take place, I leave and bequeath said estate to any child, giving preference to age, of said William and Rachel Trigg, that will marry a child of my brother James King's, or of sister Elizabeth, wife of John Mitchell, and to their issue." William Trigg and his wife both died about the year 1813, without having a daughter born to them during their coverture, whereby the perform-

ance of the condition on which the estate was devised to the testator's nephew became impossible. William Trigg and his wife left four sons, but neither of these has intermarried with a daughter of James King, or of Elizabeth Mitchell; and it is said that such intermarriage has become, by the death of some of the parties, and the marriage of others, and the advanced age of all the survivors in this class, an extremely improbable but not an absolutely impossible event. The question, therefore, whether this second limitation over is valid, or too remote and therefore void. does not arise on this record, since none of the contingencies on which it was to rest have as yet occurred. The construction of the clause of the will of William King quoted above (except the last member of it) has been determined by the supreme court of the United States, in two cases presenting this question. In the first of these cases (Finlay v. King's Lessee, 3 Pet. [28 U. S.] 346) it was held: (1) That the estate was devised to William King, son of James, on a condition subsequent. (2) That the legal title of all the testator's real estate, not specifically devised to his wife for life, vested in the devisee William King, at the death of the testator, and that the devisee took a vested remainder in the residue. (3) That the question whether William King took an estate which, in the events which had happened, (the death of William Trigg and wife without the birth of a daughter. whereby the performance of the condition subsequent had become impossible,) enured to his own benefit. or was to be considered as a trustee for the heirs at law of the testator. could not be decided in an action of ejectment. and could only be determined by a court of equity, on a bill to be brought by the heirs to enforce the execution of the trust.

In accordance with the suggestions of the supreme court. a bill was exhibited on the equity side of this court by some of the heirs-at-law of William King. the testator. praying that the judgment rendered in the action of ejectment in favor of the devisee. William King, be enjoined, and that partition be made of the real estate of said testator among his heirs-at-law, the trusts on which the legal estate was devised to William King, the younger. having failed. A decree directing partition to be made in accordance with the prayer of the bill was rendered by this court, and from this decree William King, the younger, appealed to the supreme court. After a forensic and judicial argument of eminent ability, the supreme court decided that William King. the devisee, had "no beneficial estate in fee, but an estate in trust for his issue; and that the trust having failed. there remains a resulting trust to the heirs-at-law of the testator, if the devise over does not take effect." King v. Mitchell, 8 Pet. [33 U. S.] 326. The decree of this court was affirmed. The testator, William King, died without issue. He survived his father, and his heirs-

at-law were three brothers and sisters and their descendants of the whole blood, and a half brother and half sister, who by the laws of Virginia inherit half portions. The original bill, in the causes now before the court, was filed at the December rules, 1838. The object of the bill was to have the one-fourth part of the estate of William King, the testator, which had descended to his half-brother, Samuel King, and his half-sister, Hannah Allen, set apart and conveyed to the complainant, John Vint, in virtue of an alleged purchase of those interests from John Allen and the said Hannah, his wife, by deed bearing date November 16th, 1810, and from the said Samuel King and wife, by deed dated January 1st, 1811. These deeds are filed as exhibits with the bill. Their validity has been impeached on various grounds, both by the answers and cross-bills, by the heirs of Hannah Allen and of Samuel King, and by Alexander Findlay, pendente lite purchaser from the heirs of Samuel King, of their interest in the estate of their half-uncle, William King. Several of these grounds apply in common to both deeds, and will therefore be considered in connection with both. The allegation of fraud and covin made against each, will demand a separate consideration, as the state of facts and circumstances attending the two transactions from which the conclusion of fraud. if it exist. is evolved, is essentially different in the two cases. The consideration of the claim of the personal representative, widow and heirs of Daniel Sheffey. resting as it does on grounds peculiar to itself. will be postponed until the merits of the controversy between the other parties have been discussed and determined. The objections to the validity of the deeds will be severally considered.

It is insisted in the answers and cross-bills of the defendants. that the deeds were inoperative and void because the grantors, Samuel King and Hannah Allen. were unnaturalized aliens, and therefore could inherit no part of the real estate which descended from their deceased half-brother, William King, to his heirs-at-law. The defendants, children of Samuel King and Hannah Allen, insist that, being born in Virginia. they are invested with the full rights of citizenship, and that the law of Virginia cast the descent of the proportion of the estate of which William King died seised, which their parents. if citizens, would have inherited, immediately upon them. By the stern principles of the common law. not only could an alien not inherit lands in England, but it was generally true that no inheritance could be transmitted from or through an alien ancestor, either lineal or collateral; nor was it of any consequence whether the alien ancestor through whom the party claimed were living or dead at the time of the descent cast. In either case, the alienage of the medius ancestor was an absolute bar to the descent. for an alien had no inheritable blood. This harsh feature of the

common law was abrogated in England by the statute 11 & 12 Wm. III. c. 6, subsequently modified by the statute 25 Geo. II. c. 39, and the more benign policy of these British statutes was at an early period of our history adopted in the legislation of Virginia. By the act of 1785, it was enacted, that "in making title by descent, it shall be no bar to a party that any ancestor through whom he derives his descent from the intestate is or hath been an alien." This provision has been uniformly re-enacted by all the subsequent revisals, and has constantly been perpetuated as a rule of descent in Virginia from the time of its original adoption to this hour. At the late revisal of 1849 it was re-enacted in the very language of the original act, except that the words "whether living or dead" are interpolated in brackets. This interpolation was wholly unnecessary, for it had already been decided by the unanimous judgment of the court of appeals that, by virtue of this provision a title by descent was transmissible through an alien ancestor, lineal or collateral, even though such ancestor were living at the time of the descent cast. Jacksons v. Sanders, 2 Leigh, 109. Indeed, assuming the hypothesis that Samuel King and Hannah Allen were unnaturalized aliens to be true, the present case would be precisely parallel with the case of Jacksons v. Sanders, and it would result, as a necessary conclusion from the premises, that the children of Samuel King and of Hannah Allen, who were in being at the death of William King, (having been all born in Virginia,) acquired title by descent to one-eighth part, respectively, of the real estate whereof he died intestate. But the hypothesis itself is not true. In the progress of this cause it has been ascertained, from an examination of the records of Botetourt county, in this state, that Thomas King, the father of Samuel King and of Hannah Allen, was duly naturalized on the 9th of May, 1787, and an official copy of the certificate of naturalization is filed as an exhibit in the cause. It is in proof, that the said Samuel and Hannah were both minors at the date of their father's naturalization. The only question remaining to be considered in this connection is: Did the naturalization of the father confer upon his infant children the rights of citizenship without any act of their own? The solution of this question must be found in the act of congress of 1802 [2 Stat. 153], and the interpretation placed upon it by the courts. By the 4th section of the act of April 14th, 1802, it is enacted that "the children of persons duly naturalized under any of the laws of the United States, or who, previous to the passage of any law on that subject by the government of the United States, may have become citizens of any one of the said states, under the laws thereof, being under the age of twenty-one years at the time of their parents being so naturalized, or admitted to the rights of citizenship, shall,

if dwelling in the United States, be considered as citizens of the United States."

Thomas King, an Irishman by birth, came to Virginia in 1782, was naturalized in 1787, and continued to reside in Virginia till his death, which occurred but a short time before that of his son, William King. His children, Samuel and Hannah, were born in Ireland, came to Virginia in 1792, and continued to reside in this state till after the death of their half-brother, William. If the requirement of the act, that the minor children who shall be entitled to its benefits shall be residents of the United States, has reference to the date of the naturalization of the father, then Samuel and Hannah were not naturalized by the naturalization of their father, since they were then in Ireland, and did not come to Virginia till five years after that event: but if it is to be interpreted as having reference to the date of the passage of the act, they became in virtue thereof duly naturalized citizens of the United States. This is not an open question. It was before the supreme court of the United States in the case of Campbell v. Gordon, 6 Cranch [10 U. S.] 176, and the court adopted the latter construction. They held that the act conferred the rights of citizenship upon a party who, at the date of her father's naturalization, was an infant residing in Scotland, where she was born, but who came to the United States before 1802, and resided here at the passage of the act. It is altogether clear, therefore, that Samuel King and Hannah Allen were naturalized by the naturalization of their father, and that, consequently, they and not their children were heirs-at-law of their half-brother, William King.

It is insisted again, that these deeds were void ab initio, because it is said that the grantors had no estate in the subject of the grant, but only a possibility, which at common law could not be granted, assigned or even devised unless it were a possibility of a trust. Jac. Law Dict. tit. "Possibility," 4 Coke, 66. The proposition is undoubtedly correct that the common law treated all transfers and conveyances of mere possibilities, as well as of all choses in action, as absolute nullities, and the wisdom of the common law herein is warmly commended by Lord Coke. But what does the term "possibility," as used by common law writers, import? It has never applied to interests which were vested either in interest or possession, but always to remote and improbable contingencies. A few examples drawn from the old books will illustrate the meaning of this term better than any definition, however accurate. Thus, where a term is divised to A for life, remainder to B, and B devises this future interest to C, and dies; and then A dies: this devise to C is void, and the executors of B shall have it. 3 Lev. 427, cited in Jac. Law Dict. ubi supra. So, of an assignment. A man possessed of a term for divers

years, devised the profits thereof to one for life, and after his decease to another for the residue of the years, and died: the first devisee entered by the assent of the executor and afterwards he in remainder, during the life of the first devisee, assigned it to another, and afterwards the first devisee died: it was adjudged that the assignment was void, for he in remainder had but a possibility during the life of the first devisee: for it is as much in law as if the land had been devised to him for so many years as he should live, or for the whole term, if he should live so long, so that the interest of the term, sub modo, is in him, and the other in remainder has but a possibility, which he cannot grant over. Coke, pt. 4, p. 66. Now, here the common law reasoned with its accustomed technicality. A term of however long duration is but a chattel interest, a chattel real, and the law presumed that the life of the first taker would or might endure beyond the term, and therefore the limitation over, which would have been void by way of remainder, was supported when made by will as a good executory devise: but though a good executory devise, the probability of its ever vesting was considered to be so remote as to constitute the expectant interest devised a mere possibility, whereas a like interest in a freehold estate would have been held to be a vested remainder, which the remainder-man might well assign. But though the devise of the residue of a term after a life estate was thus anciently held to be a mere possibility which the devisee, during the continuance of the life estate, could neither devise nor assign, yet Mr. Fearne cites many modern adjudications of the court of chancery to prove that, in his day even, possibilities of personal estates were devisable as well as assignable in equity. 2 Fearne, Rem. (4th London Ed.) 439, 440. And in reference to freehold interests, we are told by the same high authority that modern decisions have extended the same power of testamentary disposition to contingent and executory descendible interests by considering the word "having" in the statute of wills as equivalent to "having an interest in." In such cases, a distinction has been established between a bare possibility and a possibility accompanied with an interest: and the broad proposition is maintained, that wherever the interest, though contingent, is descendible, it is also devisable. 1 Fearne, Rem. 546.

Now, we are to determine whether the resulting trust remaining in the heirs at law of Wm. King, was a bare possibility, incapable of transfer by deed, or a vested equitable interest, perfectly susceptible of such transfer. Its equitable nature is determined by the decision of the supreme court. The whole legal estate in fee was vested in William King, son of James, but he had no beneficial interest whatever. The equitable estate was devised in contingency to the issue of a marriage between the devisee of the legal estate and an unborn daughter of parents, both of whom are dead without having a daughter born to them. The condition, therefore, on which the equitable estate was to vest, has become impossible. But this condition was not impossible when the deeds were executed to the complainant by two of the heirs at law of the testator. William Trigg and wife were then both living, and survived the execution of the deeds several years. The argument of the counsel for the defendants is, that no trust resulted to the heirs at law of the testator, until the condition on which the express trust was to vest, became impossible by the death of the Triggs without a daughter; and that the express trust having only failed at that moment, the implied trust at the same instant resulted to the next of kin of the testator, who were then in esse, to whom the equitable title then, and not till then, descended on the heirs at law of the testator. The question is an important one, because at this latter period, Samuel King, one of the grantors in the deeds, was dead, leaving children who are parties to this suit. If the position of their counsel be sound, they and not their father are heirs at law of William King. In support of this position that the next of kin of the testator who were in being at the death of Mr. and Mrs. Trigg without a daughter, are his true heirs at law to whom the trust resulted. I am referred by the counsel to two cases found in the English Chancery Reports. Upon examination, I find that they were cases, not of resulting, but of express trusts. In each case the will carried the whole estate, not absolutely indeed, but yet the whole estate. In the first of them (Harding v. Glyn, 1 Atk. 469), the testator devised certain personal estate to his wife, "but did desire her, at or before her death, to give such estate, (jewels, furniture, &c.,) unto, and among such of his own relations as she should think most deserving, and approve of." The will was held to create a trust by the force of the words above quoted, in favor of such of the testator's relations living at the death of the wife, as she should deem most deserving. It was held to be a trust in favor of his relations who should survive his wife with a power of selection by her. This power was not executed by the wife, who died without designating the favored object of her husband's bounty, and as in equity a trust never fails for want of a trustee, the execution of the power devolved upon the court. The master of the rolls said that though this was not to pass by the statute of distribution, (for it was not a case of intestacy at all,) yet that the statute furnished a good rule to go by, and he directed an equal distribution among the relations of the testator who were his next of kin at the time of her death. The other case (Cruwys v. Colman, 9 Ves. 319) is extremely similar to the first. "The testatrix bequeathed her whole estate for life to her sister, and expressed her desire that her legatee, at her own death,

bequeath to those of her own family the property given by the will, provided they behaved well to her, with decency and affection." The master of the rolls, Sir William Grant, said: "To constitute a valid trust, undoubtedly three circumstances must concur: sufficient words to raise it, a definite subject, and a certain and ascertained object. There is no doubt that in this instance the words are sufficiently certain to raise a trust. There is no doubt that there is a definite subject. The doubt is whether the object is sufficiently definite, or capable of being ascertained." The conclusion he reached was, that the word "family" used in this will, was as definite a designation of the objects of the testator's bounty, as the word "relations" used in Harding v. Glyn. In this case, as in that, the legatee for life had declined to execute the power of selection conferred by the will, and its execution devolved on the court; and the property was given to the next of kin of the legatee, in whose favor the will created the trust. It is extremely clear, then, from the review of these two cases, that they wholly fail to establish the position for which they were cited, and in the absence of any express authority to guide me, I must solve the question by the light of reason, aided by the well established analogies of the law.

The question is rendered complicated by the complete separation which the will has made between the legal and the equitable estate. The legal estate vested in William King the younger in fee, the equitable estate, so far as it is disposed of at all by the will, is devised to persons not in esse. Let us simplify the question by inquiring what would have been the effect if no divorce had been effected between the legal and equitable estates. Suppose the whole estate had been devised to William King for life, remainder to such of the children of a marriage to be consummated between him and an unborn daughter of William and Rachel Trigg, as should be living at the death of the devisee for life, in fee simple. This would be a devise to William King for life, with a good contingent remainder in fee to persons not in esse, which could never vest till the death of the devisee for life. What would become of the reversion, meanwhile? There is no principle better settled by authority than that where a remainder of inheritance is limited in contingency, by way of use, or by devise, the inheritance in the meantime, if not otherwise disposed of, remains in the grantor and his heirs, or in the heirs of the testator, until the contingency happens to take it out of them. 1 Fearne, Rem. 513. Thus, where one made a feoffment to the use of such person or persons, and for such estate and estates as he should limit and appoint by his last will in writing (Sir Edward Clere's Case, 6 Coke, 17b), one of the resolutions of the court was, that where a man makes a feoffment to the use of his last will, he has the use in the meantime. So, where the inheritance is devised in con-

tingency, it descends, if not otherwise disposed of, to the testator's heir, till the contingency is removed: as, where A devised lands to B, his heir, for life, and if B should die without issue living at his death, that then the same should remain to C in fee: but if B should have issue living at his death, then the fee should remain in the right heirs of B; it was resolved that B took an estate for life, with remainder in fee in contingency; and it was said by Wyndham and Twisden, and agreed by the other judges, that the fee descended to B as heir, until the contingency happened, though not so as to confound his estate for life, and was not in abeyance; that in relation to C, B took only an estate for life: but in the meantime, by operation of law, he had the fee in such sort, as that there should be an hiatus to let in the contingency when it happened. So in the case of Purefoy v. Rogers, 2 Saund. 380; 1 Fearne, 517, where S. devised lands to his wife for life, and if it should please God to bless her with a son, and she should call that son by the testator's Christian and surname, he gave the inheritance of the lands to him, after his mother's life, and if he died before he came to 21, then the testator gave the inheritance of his lands after his wife's life, to the testator's heirs forever. Before any son was born, the heir of the testator conveyed the estate to the wife and her second husband by fine. Saunders urged that the contingent remainder to the son was not destroyed, for that at the time of the fine, the heir of the testator had no reversion or estate in him: for that an estate for life was devised to the wife, and the remainder in fee was devised to the son in contingency; so that until it could be known whether such contingency would happen or not, the reversion must be in abeyance and not in the heir: and then his conveyance gave no estate to the husband and wife, but they were only tenants for life of the wife as before. But Hale, C. J., interrupted him and said it was clear that the reversion was in the heir of the testator by descent and not in abeyance; and accordingly it was adjudged that the contingent remainder was destroyed by the merger of the particular estate for life in the reversion conveyed by the testator's heir at law. 1 Fearne, Rem. 516; 2 Saund. 386, 387.

I have made these large citations from this celebrated work, not only because it is of the highest authority on all such questions, but because this doctrine is one of rare application in Virginia. The cases cited are sufficient to show that this old notion of the fee being in abeyance where there is a contingent limitation in fee, until the contingency happens, a notion which was adopted by a no less celebrated writer than Blackstone himself, is an egregious fallacy, and has been triumphantly exploded by Fearne. The argument of this latter writer, drawn both from reason and authority, is close, logical and unanswerable, and affords one of the most beauti-

ful specimens of demonstration to be found in any legal work. I am sure, therefore, that I stand upon impregnable ground in holding that, in case of conveyances of legal estates, either by way of use or devise, if the entire fee is not granted or devised, or is granted or devised by way of contingent remainder; in either case the reversion in fee remains in the grantor and his heirs, or descends to the heirs of the testator; and that this reversion so descending is not a mere possibility, which cannot be granted, but an estate vested in the first case, contingent in the latter, which may be conveyed as effectually as if it were vested in possession as well as in interest. All the cases cited above illustrate and establish this proposition.

But the resulting trust remaining in the testator's heirs at law, in the case at bar, is not a legal, but an equitable estate. Does equity adopt a different rule from that adopted by the law courts, or does it follow the law? It is generally true that equity applies the same rules of construction to trust estates, that a court of law applies to legal estates. This general proposition is liable to many exceptions where a departure from the rigid technical rules of law is necessary to give effect to the limitations of the trust estate. These exceptions need not be here discussed, since the case at bar does not fall within the operation of any of them, but must be governed by the general rule. Fearne says, after noticing some of those exceptions, and particularly cases in which Lord Hardwick had denied the application of the rule in Shelley's Case, to limitations of trust estates, that "even a court of equity, in order to preserve as near a correspondence as may be, between the rules of construction, with regard to trust estates and those laws by which legal estates are construed, considers itself as bounden, even in the case of trust estates, to decree according to the rule I have been speaking of, whereever it can be done without manifest violation of the intention of the parties. Of this, the case of Sweetapple v. Bindon [2 Vern. 536], is a strong instance. Thus where A. by will gave £300 to her daughter to be laid out in land and settled to the use of her said daughter and her children, and if she died without issue, remainder over. The daughter married, and after her decease a bill was brought by her husband to have the money laid out in land, and the land settled on him for life, as tenant by the curtesy, or to have the interest of the money for life, in lieu of the profits of the land. The court held that if it had been an immediate devise of the land, the daughter would have been, by the words of the will, tenant in tail, and consequently the husband would have been tenant by the curtesy; and that in case of a voluntary devise, the court must take it as they found it, and not lessen the estate or benefit of the legatee; although, upon like words in marriage articles, it might be otherwise, where it appeared the estate was intended to be preserved for the benefit of the

issue; and therefore decreed the money to be considered as lands, and the husband to have the interest for his life, as tenant by the curtesy. 1 Fearne, Rem. 184 and 164. In discussing the same rule, Judge Story says that trusts in real property which are exclusively cognizable in equity, are now, in many respects, governed by the same rules as the like estates at law, and afford a striking illustration of the maxim, "Aequitas sequitur legem." Thus, for example, they are descendible, devisable and alienable; and heirs, devisees and alienees, may, and generally do take therein the same interests in point of construction and duration, and they are affected by the same incidents, properties and consequences, as would, under like circumstances, apply to similar estates at law. 1 Story, Eq. Jur. § 974. These authorities are apt and conclusive to show that in cases like that at bar, the same rule of construction must be applied in equity to the equitable estate or resulting trust remaining in the heirs at law, that a court of law would apply to legal estates similarly circumstanced; and since we have already shown that if this had been a legal estate, the reversion not disposed of by the will would have descended to the heirs at law, and not have remained in abeyance; that such reversion, so descended, would have constituted not a mere possibility, but a vested estate, susceptible of transfer by deed or devise; it results that the equitable estate here was impressed with the same qualities, and that this objection to the validity of the deeds from Samuel King and from John Allen and wife to John Vint, is not well taken.

The question of fraud arising in this case next presents itself for consideration, but a preliminary objection raised by the counsel for the complainant, must first be disposed of. This is a bill for partition, and as there is no question as to the genuineness of the deeds under which the complainant claims, it is said that he has a right to demand partition of this estate ex debito justitiæ, and that this court cannot take cognizance of the question of fraud in such a suit. A decision of the court of appeals of Virginia, is cited to sustain this proposition. Wiseley v. Findlay, 3 Rand. [Va.] 361. It was held in that case, that an application to a court of equity for partition, was not an appeal to the sound discretion of the court, to be granted or refused, according to the circumstances of the case, as in cases of specific performance and other cases, but to be due ex debito justitiæ. It is a remedy substituted for the perplexed and difficult remedy by writ of partition, a remedy which is now wholly obsolete. The only indispensable requisite, says Judge Green, in his opinion in that case, to entitle the plaintiff to relief in such cases, is, that he shall show a clear legal title. If this title is disputed or doubtful, as if there be a question whether the deeds under which he claims are forged, or if his title depends upon difficult and doubtful questions of law which are emphatically proper for a court of law; the de-

cree for partition is suspended until he establishes his title at law, not in a writ of partition, but by ejectment or other legal remedy. And if in such proceeding he establishes the genuineness of his title papers, or the questions of law on which his title depends, are decided in his favor, he returns to the court of equity, and partition is decreed according to his established rights. In these views of Judge Green, the whole court concurred, and I am satisfied that the conclusion of the court is abundantly sustained by authority. But there are several reasons why this case, in my view of it, has no application to the case at bar. The narrow jurisdiction exercised by courts of equity in ordinary bills for partition, results chiefly from the consideration that its jurisdiction is exercised only concurrently with that of a court of law; that it is a mere substitute for the inconvenient remedy at law by writ of partition, and the measure of relief is, therefore, the same in both courts. But the jurisdiction exercised by this court in the case now before it, is not a concurrent, but an exclusive jurisdiction. The complainant stands upon a pure equitable title, of which a court of law would not take cognizance at all, and in such cases, a court of conscience may apply its own peculiar and established principles. One of the most cherished and valued of these principles is, the application of its power to detect and eviscerate latent frauds and concealments which the process of a court of law is not adapted to reach, and to relieve against them. But even if the complainant had come into this court with a clear legal title, I apprehend that the court would not be precluded from opening the question of fraud in the actual state of the pleadings in this cause. This case does not stand upon the original and supplemental bills, and the answers thereto, but by special leave of the court, the original defendants have filed cross-bills, impeaching the conveyances under which the complainants claim for fraud. These cross-bills were filed many years since, and the complainant, instead of demurring to them, as he might well have done if the question of fraud could not be investigated on a bill for partition, has answered denying the fraud, the evidence has been taken to meet the issue arising on these pleadings, and the objection to the jurisdiction of the court to investigate the whole merits of the case, as it stands upon the pleadings and evidence, raised for the first time in the argument at the bar, is not entitled to the favorable consideration of the court. Judge Green says, in the case last cited, that a decree of partition would in nowise prejudice the rights of the defendants, and intimates that they would be entitled to relief in a court of equity, by a bill impeaching the conveyances on the ground of fraud. As the cross-bill is in some sort, a substitute for an independent bill by the original defendants, I cannot perceive why the same measure of relief may not be afforded in this form of proceeding.

I proceed to inquire, whether the defendants have been successful in their efforts to invalidate the conveyances under which the complainant claims. The first of these deeds, in the order of time, is the deed from John Allen, and Hannah his wife, to the complainant Vint, dated November 16th, 1810. The deed purports to convey "all the right, title, property, interest, claim and demand which the said John Allen and Hannah, his wife, have in the estate of William King, the half-brother of the said Hannah, lately deceased, the specific legacies in the will of the said King to the said Hannah and her children only excepted, being one-eighth part, as well as one-fifth part of Samuel King's part in the estate of the said William King, deceased, which the said John Allen hath purchased from the said Samuel King, the half-brother, &c." The reservation of the one-fifth part for the benefit of Daniel Sheffey will be hereafter considered. The terms here used are very comprehensive. The deed was drawn by Andrew Russell, clerk of Washington county, at the mutual instance of Allen and Vint. Its execution by those parties is duly proved. Its execution also by Mrs. Allen, in due form of law, on the same day on which it was executed by the other parties, is shown. It was spread upon the records of Washington county in May, 1811. Thus, everything is regular on the face of the transaction; it is an executed contract, and if the deed was inoperative and void, it is because either no valuable consideration moved from Vint to the grantors, or a consideration so grossly inadequate as to amount to proof of fraud. Both grounds are insisted on by the plaintiffs in their cross-bills. The deed having been regularly executed for the expressed consideration of $18,901.27, the law presumes the transaction to have been fair and bona fide until the contrary be shown. Fraud is never presumed by the law; it must always be proved, and the onus is upon the party alleging it. Was any consideration paid by Vint to Allen? It is proved by the depositions of Andrew Russell and David Stout, that recently before the execution of this deed John Vint had in his possession, at the house of the grantor Allen, store goods of considerable amount. These goods were transferred to Allen, and constituted, according to the statement of Allen, made at the time of the contract, the consideration of the deed, except a debt of $2000 previously due by Allen to Vint, which was extinguished by the sale. We have no means of determining with accuracy, or even of making a reasonable approximation to the value of these goods. But it is in proof that the stock of goods was considerable, that the shelves were well filled and made a handsome display. The whole of Vint's visible estate consisted in this stock of goods, and after the sale he seems not to have been in possession of property. There was, then, valuable consideration moving from Vint to Allen to a considerable amount, but it is by no means clear that it amounted or approximated to the sum expressed in the deed. It would

seem from the affidavit of Vint, that the real consideration was but $10,000, and that a larger sum was inserted at the suggestion of Allen, to improve his credit with his creditors at the North! The conduct of Vint, in acquiescing in this fraudulent suggestion is wholly indefensible, in foro conscientiæ, but as between the parties themselves, and those claiming under them, it does not vitiate the contract if an adequate consideration was in truth paid. Assuming, then, that $10,000 was the actual consideration for the purchase, is this sum so grossly inadequate as to amount to proof of fraud, vitiating the entire contract and rendering it null and void?

This is confessedly a most delicate ground of equitable jurisdiction. Mere inadequacy of price, or any other inequality in the bargain, is not to be understood as constituting, per se, a ground to avoid a bargain in equity. For courts of equity, as well as courts of law, act upon the ground that every person who is not, from his peculiar condition or circumstances, under disability, is entitled to dispose of his property in such manner and upon such terms as he pleases, and whether his bargains are wise and discreet or otherwise, or profitable or unprofitable, are considerations not for the courts of justice, but for the party himself to deliberate upon. Yet there may be such an unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition or some undue influence, and in such cases, courts of equity ought to interfere on the satisfactory ground of fraud. But the inadequacy must be so gross as to shock the conscience, and amount, in itself, to decisive evidence of fraud. 1 Story, Eq. Jur. §§ 244, 246. If courts of equity were to undertake to unravel all the transactions of men, and set aside all their improvident contracts as void, they would produce far more mischief than they would correct. On the other hand, were they to refuse relief in such extreme cases as we have supposed, fraud and chicanery would be unchecked, and equity tribunals would become a mockery and a cheat. Such, then, being their recognized and well established principles; I am now to apply them to the transaction in question. Was the sum of $10,000 so grossly inadequate a consideration for the one-eighth part of the estate of William King as to constitute, per se, evidence of fraud? To answer this question intelligently, we must recur to the circumstances under which this contract was made. William King died in October, 1808, leaving a colossal fortune, but he did not leave it, or supposed he had not left it, subject to the disposition of the law. Far better had it been for the interests of his next of kin had he done so. He made a will in which he supposed he had given a direction to his splendid estate very different from that which the law would have given it. His half-brother and half-sister were not peculiar objects of his bounty, for he had cut them off with very trifling pecuniary legacies. When the testator wrote his will he was childless, and his primary object seems to have

been, in the event of his leaving no children of his own, to give his vast estate, subject to a very liberal provision for his wife and some other favorite relatives, to the issue of a marriage to be consummated between his nephew, William King, son of his brother James, and a daughter, not then born, of William Trigg, a brother of his wife, and Rachel Trigg, wife of William Trigg and niece of the testator, which issue would thus have united the blood of his own family and of that of his wife. The language of his will is: "In case of having no children, I then leave and bequeath all my real estate, at the death of my wife, to William King, son of brother James King, on condition of his marrying a daughter of William Trigg and my niece Rachel, his wife, lately Rachel Findlay, in trust for the eldest son or issue of said marriage: and in case said marriage should not take place, I leave and bequeath said estate to any child, giving preference to age, of said William and Rachel Trigg that will marry a child of my brother James King's, or of sister Elizabeth's wife of John Mitchell, and to their issue." There is no limitation over in the event of all these trusts taking effect. The testator seems not to have contemplated the failure of all these marriages as within the range of any reasonable probability, and yet, the trusts have all failed. William and Rachel Trigg have been long dead, never having had a daughter, and none of the other contemplated marriages have as yet occurred. We now know how the supreme court have expounded the obscure clause in the will of the testator quoted above. They have said that the will clothed William King, son of James, with the whole legal estate, but without any beneficial interest whatever, in trust for persons not then in esse, and, as subsequent events have shown, who have never yet come into being, and that no disposition of the equitable estate having been made by the will, until it should vest by the occurrence of some one of the specified contingencies, a resulting trust remained in the heirs-at-law of the testator. Now, in determining the question of inadequacy of consideration, we must look to the actual state of things existing when this contract was made, and we cannot fail to see that the contract, on the part of Vint, was of an extremely hazardous nature. It was doubtful whether Hannah Allen had any interest in the estate, and if she had, the chances, humanly speaking, of its being diverted by the occurrence of some one of the various contingencies specified, would seem to have greatly preponderated over the chances of the failure of all. We have no standard furnished whereby we can estimate the value of interests so precarious, and without such data to determine their value, it is impossible to say that the price was grossly inadequate. My opinion, then, is, that the deed from John Allen and wife to the complainant was founded upon a valuable and sufficient consideration, and that this court should not interfere with its legal operation.

The effect of the subsequent contract of

the 6th April, 1812, between John Allen and the complainant, upon the rights of the parties, will be determined after deciding the question of the validity or invalidity of the deed of January 1, 1811, from Samuel King and wife to John Vint. The last mentioned deed is also assailed by the heirs of the grantor, Samuel King, and by Alexander Findlay, a pendente lite purchaser from those heirs, in their answers and cross bill, as fraudulent and void. This deed is founded upon the expressed consideration of $10,000. It purports to convey to Vint "all the right, title, property, interest, claim and demand which the said Samuel King and wife now have in the estate of William King, the half-brother of said Samuel, lately deceased, the specific legacies only excepted, the portion of the estate of the said William King hereby intended to be conveyed to the said John Vint, reserving one-fifth of the estate which descended to his heirs or the said Samuel King, it being already sold and conveyed to John Allen for his trouble in carrying on the said suit as specified in a former conveyance, by John Allen and Hannah his wife, to said Vint." This deed was acknowledged in the clerk's office of Pulaski county, Tennessee, on the 29th January, 1811, by Samuel King and wife, and admitted to probate, (the parties residing in that county and state,) but was not recorded in the clerk's office of Washington county, until 25th September, 1837. In his original bill the complainant alleges that the deed was made to him by Samuel King and wife for the consideration of $10,000; in his supplemental bill he says it was founded upon full and fair consideration. Are these allegations true? In the cross-bill filed by Alexander Findlay, it is charged that the real consideration of the deed was not $10,000 as alleged, but $6,000; that the purchase money was to be paid in ten annual instalments of $600 each, and that ten bonds were executed by Vint to King for the amount of these instalments respectively; that nine of these bonds were in possession of Vint, and that no part of the purchase money had ever been paid to Samuel King. These allegations, except the last, are all admitted to be true by Vint in his answer to the cross-bill, and the nine bonds are accordingly produced as exhibits. He avers that he had paid off these bonds, but not to Samuel King. The amount is alleged to have been paid to John Allen, King's brother-in-law, in a settlement between Vint and Allen, on the 6th April, 1812. Samuel King was then in his grave, having mysteriously disappeared in the February preceding, and being never heard of more. He had come from his home in Kentucky to Abingdon, to draw the small annuity given him by the will of his half-brother, William King, on the express condition that he should apply for it in person. How did Allen acquire possession of these bonds? That can never certainly be known. Vint says he supposed he had acquired them fairly by some satisfactory arrangement between him and King. He did not

suppose that they were in Allen's possession as King's agent to collect them, for he says that he gave Allen credit on his own account for the amount, and that they constituted part of the $11,600 for which he gave his receipt to Allen on the 7th April, 1812. He supposed that Allen had acquired the legal ownership of the bonds, as he avers. Why, then, was there no endorsement on the bonds? With his intimate knowledge of the circumstances and character of Allen, he had no right to suppose that he had acquired them fairly by the payment of valuable consideration. If Vint believed that the transaction was a fair one, why did he subsequently go to Kentucky and purchase the dower right of Samuel King's widow? If the transaction was fair she had no interest in the subject, for she had relinquished her dower right by joining her husband in the deed and executing it with all due formality. The evidence abundantly shows that no part of the purchase money was ever paid by either Vint or Allen to King in his lifetime, or his representatives since. Was the contract of the 1st January, 1811, entered into in good faith on the part of Vint? There is too much reason to believe the contrary. Samuel King was an incorrigible bloated drunkard. Some of the witnesses say that they had never seen him in a fit condition to transact business. The character of John Allen was singularly infamous, and he is the most prominent actor in the contract between Vint and King, which resulted in the execution of the deed. The contract, the bonds, the deed are all in his handwriting, and Vint says in his affidavit that he bought Samuel King's interest from Allen. The transaction wears throughout the worst possible aspect, and I shall render a decree pronouncing the deed from Samuel King and wife to Vint null and void, and, if necessary, directing a reconveyance from the heirs of Vint, or by a commissioner of the court specifically appointed for that purpose.

This conclusion, of course, renders it quite unnecessary to notice that part of the argument of the counsel for Alexander Findlay, in which they attempted to establish that even if this deed should be pronounced valid, the language employed in the operative part of the deed would require the court to narrow its operation to Samuel King's interest in the personal estate, or at least to exclude from its operation the Salt Works property, of which partition could not be demanded until after the death of the widow of William King. Having thus arrived at the conclusion that the deed from Allen and wife to Vint was valid, and that from Samuel King and wife to Vint was null and void, it next becomes necessary to determine what proportion of the estate of William King which descended to his heirs at law, was conveyed by the first of those deeds, and what proportion of the same estate the second deed purported to convey. In reference to the first question, some difficulty is produced from the apparent inconsistency between different parts of the deed. The first of these apparently con-

flicting clauses purports to convey the one-eighth part of the estate which had descended to the grantor, Hannah, as one of the heirs at law of her half-brother, William King, "as well as one-fifth part of Samuel King's part in the estate of the said William King, which the said John Allen hath purchased from the said Samuel King, the half-brother of the said William King, deceased." The deed then proceeds thus: "The one-fifth part of the interest of the said John Allen and Hannah, his wife, either as heirs or as purchasers from Samuel King, without the specific legacies, being reserved as a compensation to Daniel Sheffey, Esq., for his labor and trouble as counsel employed to recover said part of the estate of the said William King, as shall descend to the said John Allen and Hannah, his wife, either as heir to the said William King, or by purchase, as aforesaid, from Samuel King." If the deed had gone no further, I should feel no difficulty in saying that it purported to convey the one-eighth and the one-fifth of an eighth of the whole estate, with a declaration of trust as to the fifth of an eighth in favor of Daniel Sheffey. But the following clause shows an explicit purpose to restrict the operative words of the conveyance to the one-eighth part of the estate which descended to Mrs. Allen. The language is: "The portion of the estate of the said William King, deceased, hereby intended to be bargained, sold, and conveyed to the said John Vint, being one-eighth part of the estate which may descend to his heirs." This is sufficiently explicit, and as we are required in the interpretation of all documents to expound them so that every part shall, if possible, take effect, I construe the deed in question as conveying, and as purporting to convey to the grantee only the one-eighth part of the estate of William King, which descended to the grantor, Hannah Allen, with a declaration of trust in favor of Daniel Sheffey as to the fifth of an eighth, which fractional part was intended to be retained by John Allen, as trustee for Daniel Sheffey. In pronouncing, therefore, the deed from Allen and wife valid, as having a sufficient consideration to support it, the grantee, Vint, becomes, by operation of the deed, invested with the legal ownership of the one undivided eighth part of the estate of William King, deceased, not specifically devised. But the deed from Samuel King and wife to Vint, which has been annulled, only purported to convey four-fifths of the estate which descended to him as heir at law, the deed in express terms "reserving one-fifth of the estate which descended to Samuel King, it being already sold and conveyed to John Allen for his trouble in carrying on the said suit, as specified in a former conveyance by John Allen and Hannah, his wife, to said Vint." The question, what is the effect of this recital, and whether it operates as an estoppel on Samuel King and his heirs, and all persons under him, mediately or immediately, by title subsequently acquired, to deny the execution of the recited deed, is one of very grave moment, but I am of opinion

that this question cannot be properly decided in the present state of the pleadings in this cause. The recital refers to a deed from Samuel King to John Allen, the existence of which does not otherwise appear than by the recital itself. If such a deed was made, it is incumbent on the party claiming a benefit under it to produce it; or, if it cannot be produced by reason of its loss, the party seeking to set it up as a lost deed, must lay a proper foundation for proving its contents by showing its loss. That fact should be distinctly put in issue by the pleadings. The court cannot incidentally take cognizance of such a question. If Allen's heirs seek to have the deed set up in equity, they must comply with the terms which equity prescribes. They must bring their bill, alleging the execution of the deed and its loss, and thus afford an opportunity to the heirs of the supposed grantor, or the purchaser from them, to contest the claim. Such an opportunity has not been afforded to those parties by the pleadings in this cause. The execution of such a deed, or its loss, is nowhere alleged by Allen's heirs, either in their answer or cross-bill, while the fact of its execution is expressly denied by Alexander Findlay in his answer to the complainant's bill. No attempt, then, having been made on the part of Allen's heirs to set it up against the claimants under Samuel King, I cannot inquire here into the effect of the recital in the deed from Samuel King to Vint, acknowledging the previous execution of the deed in question to John Allen. As the case now stands, I must assume that the remaining one-fifth part of the estate of William King, which descended to Samuel King, and which was not embraced in the deed from Samuel King and wife to Vint, was never conveyed by him, and consequently descended to his heirs at law.

The next question presented for solution is of no little difficulty and perplexity. The original bill was brought to secure to the complainant the benefit of the two deeds from Allen and wife, and Samuel King and wife, and it does not appear from that bill or the supplemental bill, that there was any subsequent contract between the plaintiff and any other party whereby the title acquired by the plaintiff by operation of the deeds, was lost, modified, or in anywise affected. This new phase of the case is put upon it by the cross-bill of the heirs of John Allen, and the answer to that cross-bill by the original plaintiff, John Vint. A somewhat detailed statement of these pleadings is necessary to the development of the question which they present for adjudication. The cross-bill charges that the complainant, in filing his bill and supplemental bill, had fraudulently suppressed the important fact that, by a contract between the complainant and John Allen, the ancestor of the plaintiff in the cross-bill, subsequent to the execution of the deeds from Allen and wife, and from Samuel King and wife to Vint, dated April 6th, 1812, Vint had resold a moiety of

the two shares thus acquired, to Allen, for the price of $14,450.63; that $11,600, part of the purchase money under this new contract, was paid by Allen to Vint on the 7th April, 1812, evidenced by Vint's receipt of that date; and that the payment of the residue must be presumed after so great a lapse of time. The contract and receipt are exhibited by the complainants with their cross-bill, and the alternative prayer is, that the court will annul, by its decree, the deed from Allen and wife to Vint of the 6th November, 1810; or, that it shall compel Vint to execute specifically his contract by a conveyance to the plaintiff of the moiety of the two shares sold by him to their ancestor; or, if the contract be rescinded, that the court render a decree directing Vint to refund the said sum of $11,600 with its accruing interest since April 7th, 1812.

The defendant Vint, in his answer, admits that the contract of April 6th, 1812, was entered into between himself and John Allen, but insists that the contract was avoided by the failure of Allen to comply with the condition on which Allen could call for a conveyance, viz: the payment of the purchase money within five years. He denies that the said Allen or any other person, did pay to him within five years after the date of the agreement, or at any other time the said purchase money. He admits the execution of the receipt to John Allen, of April 7th, 1812, for $11,600, but denies that he did in fact receive of Allen the sum of money for which the receipt was drawn. He specifies various items as composing the aggregate sum mentioned in the receipt. He says he distinctly recollects, that as part of the said sum of $11,600, he received from John and W. Allen their order upon John Jett, for $2,333, which, when presented for payment, was protested by Jett, of which refusal and protest Allen had notice. This order is filed as an exhibit, with the answer, and the respondent avers that no part of it was ever paid either by the drawers, drawee or any other person. The answer says in the second place, that the sum expressed in the receipt was constituted in part of debts due by Vint, which Allen assumed to pay for Vint, and which he had only partially paid. Thirdly, the respondent says that the balance due by him to Samuel King, of four or five thousand dollars on account, of the purchase money for his interest, conveyed by the deed of January 1st, 1811, was settled by John Allen, and that the sum was included in the sum of $11,600, specified in the receipt. That before the receipt was executed, Allen procured from Samuel King, and handed over to Vint the notes which Vint had given to Samuel King for the balance of purchase money due to him, and that the amount so settled by Allen with King, was all that Vint ever realized on account of said receipt. The respondent repels, with apparent indignation, the charge of fraudulent suppression

of these two papers, made by the plaintiffs in their cross bill, and says that the charge cannot be true, since these papers were not retained by him, but were handed over to their ancestor; and, as he and his heirs were interested in these papers, he supposed that they would take care of them, and at all times have them at their command. Upon this state of the pleadings, several important questions are evolved, which will be severally considered, though not in the precise order in which they are presented.

The profound silence of the complainant Vint, in his original and supplemental bill, with reference to this subsequent contract between Allen and himself is significant and suspicious, and the excuse alleged for it in his answer to the cross bill is not satisfactory. In those bills, he asserts his legal and equitable right to demand that the two shares of the estate of William King, of one-eighth each, which had descended respectively to Samuel King and Hannah Allen, should be confirmed to him by virtue of the conveyance to him of those shares, by the deeds of November 16th, 1810, and January 1st, 1811, for which he says he had paid full and valuable consideration. Assuming it to be true that he had paid the purchase money in full for Samuel King's share, yet, by his own showing, he had paid it to Allen and not to King. Now, Allen had acquired those bonds given by Vint to King, fairly or surreptitiously. If fairly, then Allen's heirs had a right to demand either specific execution of the contract of re-sale, in consideration of the part payment of the purchase money for which they were received by Vint, or a rescision of that contract of re-sale, and to have the amount refunded by Vint: if surreptitiously, Samuel King's heirs had a right to demand either that their ancestor's deed be annulled as fraudulent, or that the stipulated purchase money be paid to them. Upon either hypothesis, the assertion of Vint in his bill, that a perfect equitable right to both shares had vested in him, and was a subsisting title at the time of the institution of his suit was untrue, and I am constrained to think, therefore, that in claiming the full benefit of his deeds, as executed contracts for which a full consideration had been paid, he was guilty of a fraudulent purpose in deliberately suppressing the fact, that the subsequent contract of re-sale had been entered into, and partial payments made in virtue of it. We might have charitably imputed his silence on this subject, to the fallibility of human memory, had he allowed us to do so. But his silence proceeded, according to his own showing, not from any lapse of memory, but from the persuasion that "as Allen and his heirs were interested in said papers, he supposed that they would take care of them, and at all times have them at their command." The original actors in these transactions, had all been long dead, except the complainant himself: twenty-six years

had elapsed before the filing of the bill, in the meantime the plaintiff Vint, had made an absolute conveyance of the entire interest conveyed by both the deeds, and obtained a reconveyance; and the conclusion cannot be easily resisted, that in suppressing, not the papers, indeed, but the facts which they disclose, the complainant took the chances of profiting by the ignorance of the heirs of Allen, and the loss of the evidence of their rights resulting from lapse of time. I do not by any means intend to say that, even in a court of conscience, it is in all cases incumbent on the plaintiff to assist his adversary in making out his case. When the transactions are recent and the actors in them living, the plaintiff in equity may well forbear to state facts which may militate against his own title, knowing that his adversary is cognizant of them, and may avail himself of them in his defence. But where, as in the case at bar, the original parties are all dead but the plaintiff himself, the willful suppression of important facts, of which his adversaries can have no personal knowledge, is a fraud which deserves the severest animadversion of the court. But however reprehensible such conduct may be, it cannot vitiate the original contract between the parties, which must, as I have already said, for reasons stated elsewhere in this opinion, be treated as a valid and executed contract, founded upon a sufficient and valuable consideration. The remaining inquiries are in reference to the case made by the cross bill of Allen's heirs and the answer of Vint: are the plaintiffs, heirs of John Allen, entitled to demand specific execution of the contract of re-sale, of the 6th of April, 1812? If not what is the measure of relief to which they are entitled?

First, then, in relation to the prayer for specific execution. A bill for specific execution of a contract is not entertained in equity as a matter of right, but it is addressed to the discretion of the court; not, indeed, to its arbitrary and capricious discretion, dependent upon the mere pleasure of the judge, but to that sound and reasonable discretion which governs itself, as far as it may, by general rules and principles; but, at the same time, which grants or withholds relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between the parties. On this account, it is not possible to lay down any rules and principles which are of absolute obligation and authority in all cases. Story, Eq. Jur. § 472. Let us see, then, the terms of the particular contract sought to be enforced here, and the circumstances under which the aid of this court is invoked to compel its execution. There is no ambiguity in the terms of this agreement. It is an executory contract, by which Vint agrees, in consideration of $14,450.63, to be paid to him by Allen, to make over and convey to the children of John and Hannah Allen, born and to be born, one-half of all the interest

which Vint acquired by the conveyances from Allen and wife, of the 16th of November, 1810, and from Samuel King and wife, of January 1st, 1811. It is further agreed that Allen and Vint shall contribute equal portions of the expenses to be incurred in the prosecution of suits for the recovery of the estate, but that until the payment by Allen to Vint, of the stipulated purchase money. Vint shall not be compelled to convey the moiety thus sold to the children of John and Hannah Allen, and that if Allen should fail to pay the purchase money to Vint, for the period of five years from the date of the contract, the agreement shall be void and of no effect. On the day following the execution of this agreement, Vint executed his receipt to Allen for $11,600, in part payment of the purchase money, and there is no evidence in the cause of any other payment being made by Allen, unless the payment of the residue may be reasonably presumed after so great a lapse of time. But I am of opinion that the insolvency of Allen, which is abundantly established by the depositions of several witnesses, from a period anterior to the date of this contract until his death, completely repels any such presumption.

There has not, then, been a full performance by Allen of the contract on his part, and the question to be decided on this branch of the case is, do the heirs of Allen occupy a position here, entitling them to demand a specific execution of the contract on the part of Vint, by a conveyance of the moiety of the estate held by him, under the deeds from Allen and wife, and from Samuel King and wife? By reference to the terms of the contract, we perceive an express stipulation, that if Allen did not pay the purchase money within five years from the date of the contract, the contract itself should be void and of no effect. As the whole purchase money was not paid within the prescribed period, according to the strict terms of the contract, it became void. Was time, then, of the essence of this contract? If it was, this court ought not to decree its specific execution at the suit of a party who has failed to comply with it within the period prescribed by its terms; if not, specific execution may be decreed, though there has not been full performance of the contract on the part of the party seeking its enforcement. Time is not generally deemed in equity, to be of the essence of the contract, unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract. 2 Story, Eq. Jur. § 776. Ordinarily, the non-payment of money by a stipulated day, is not, per se, sufficient to defeat the claim of a party to specific execution of the contract, since interest will compensate the defendant for the delay, and equity relieves against forfeitures, whenever it can make adequate compensation. The case of a mortgage well illustrates the doctrine of equity on this subject. The general intention of the parties in entering into such a contract, being a mere security for money, equity, looking rather to this general intention than to the

strict terms of the mortgage deed, relieves against the forfeiture by allowing the defaulting debtor to redeem, on condition of his paying interest upon the debt, so long as the payment of the interest has been withheld. In this and all similar cases, interest is deemed a full compensation to the creditor, but where the object of the contract is a sale, and not a mere security for a debt, and the parties have expressly stipulated that unless payment of the purchase money be made by an ascertained day, the executory contract shall be null and void, there is no room for speculation as to the intention of the parties. They must be held to mean what they have clearly expressed, and to compel a conveyance by the vendor at the suit of a vendee who had not paid or tendered the purchase money according to the terms of the contract, would in truth be, not the enforcement of the contract between the parties, but the assumption of authority by a court of equity to make a contract for the parties which they have not made for themselves. "I do not see, therefore," says Baron Alderson, in a similar case, "why, if the parties choose, even arbitrarily, provided both of them intend so to do, to stipulate for a particular thing to be done at a particular time, such a stipulation is not to be carried literally into effect in a court of equity. This is the real contract. The parties had a right to make it; why, then, should a court of equity interfere to make a new contract, which the parties have not made? It seems, to me, therefore, that the conclusion at which Sir Edward Sugden, in his valuable treatise on this subject has arrived, is founded in law and good sense." Opinion of Alderson, B., cited in a note to 2 Story, Eq. Jur. § 776. I think, then, that the parties here have chosen, by the express terms of their contract, to treat time as of its essence, and that this court has no power to decree its specific execution. But if this were doubtful, there are obvious considerations why the court, in the exercise of that sound discretion to which such bills are always addressed, should refuse to render any such decree. The party seeking the specific execution of a contract, must himself be guilty of no laches. In the language of the books, he must show that he has proceeded without unreasonable delay, and that he has been "ready, desirous, prompt and eager to perform the contract." This consideration would be fatal to the pretensions of plaintiffs who bring their bill more than a quarter of a century after the date of their ancestor's contract. The impolicy and injustice of entertaining such bills after a great lapse of time, and the consequent changes wrought in the relations of the parties, and of the subject of the contract could not be better illustrated than by the circumstances attending the case at bar. At the date of this contract, the extent of the interest of Vint in the estate of William King, assuming that both his deeds were valid, was involved in very great doubt. It depended upon the construction to be afterwards placed by the courts on the will of William King, and on this subject conflicting views were entertained by the most learned lawyers. But even if there had been no controversy on this point, there was a strong probability that some of the limitations of the will might become vested, by the happening of some one of the contingencies, on the occurrence of which the resulting trust in the heirs at law would be divested and defeated. The state of things then existing had wholly changed when this cross bill was filed. The defeat of that resulting trust had then become, if not absolutely impossible, certainly altogether improbable. To decree specific execution under such circumstances would be to place the vendee and his heirs on more favorable ground than they would have occupied if they had shown themselves "ready, desirous, prompt and eager to perform the contract." A court of equity will never allow a party to derive an advantage from his own laches. On the whole, I am well satisfied that the heirs of John Allen. the complainants in this cross bill, do not occupy a position entitling them to demand of John Vint, specific execution of his contract with their ancestor, and that this prayer of their bill must be denied.

But it is equally clear, that the alternative prayer of the bill that the contract be rescinded, and the purchase money paid by Allen, be refunded by Vint. must be granted whenever the party entitled to receive it is before the court. That party is the personal representative, and not the heir of John Allen, and he is not a party to this suit. There cannot, therefore, be a decree for a payment of this money until the personal representative is before the court, and until he is made a party; it might seem premature to decide any other question in reference to this fund. But as the parties beneficially interested in the question are already in court. I deem it not irregular to state my views in reference to the decree which it will be proper to render when the personal representative is formally made a party. For what sum, then, should a decree be ultimately rendered in favor of the personal representative of Allen against Vint's representatives? This is a question on which I have felt great embarrassment and difficulty. It is insisted, on the one hand, that a decree should be rendered for $11,600, the sum expressed in the receipt from Vint to Allen, of April 7, 1812, with interest from that date. On the other, it is denied that the sum of money expressed in the receipt, or any part thereof, was paid. The execution of the receipt being admitted, it must certainly be regarded as prima facie evidence of the payment (3 Starkie, Ev. 1273, 1274); and the question arising here is, has the presumption of payment which the law raises from the execution of the receipt been repelled by the evidence in the cause? In his answer to the cross bill, Vint denies that the money was in fact paid, and avers that the sum specified in the receipt was compounded in part of two large items, viz: nine of the bonds given by Vint to Samuel King, which were surrendered to him by Allen, each for

$600, payable in instalments at a future day, and a draft of J. & W. Allen, on John Jett, for $2,333, which proved to be wholly unproductive. The bonds and draft are both produced by Vint, with his answer. If the allegations be true, Vint would, of course, be entitled to a credit against his receipt, of these amounts. But no discovery is sought in the cross bill from Vint, whether he had in fact received the sum specified in the receipt. and the above recited allegations of his answer, not being responsive to the bill, are not evidence that can avail the respondent. We must look, then, to the evidence in the cause, other than the answer of Vint, to determine whether the presumption of payment has been successfully repelled. The notorious insolvency of Allen, at the date of this receipt, and his consequent inability to pay any considerable sum; the fact of the possession of the bonds by Vint, which he had previously given to Samuel King for the purchase money of his interest; the reduced circumstances of Vint, after as well as before the date of the receipt; and the possession of the draft on Jett from J. & W. Allen, bearing even date with the receipt, are all circumstances tending to prove, either that the sum specified in the receipt was not paid at all by Allen, or that it was not paid in money. These circumstances are calculated to throw a deep shade of suspicion upon the bona fides of the whole transaction, but are not deemed sufficient to warrant me in pronouncing, with the imperfect lights now before me, the whole transaction to be fraudulent and fictitious. In this state of obscurity and indefiniteness of the evidence in the cause, I shall direct proper issues to be made up and tried by a jury, to determine the question whether any, and if any, what payments were made by John Allen to John Vint, in part execution of the executory contract of 'sale between those parties of April 6, 1812; and whether the nine bonds produced by Vint were delivered by Allen to him, and whether the amount appearing due by them constituted part of the sum of $11,600 specified in Vint's receipt; and lastly, whether the draft for $2,333, purporting to have been drawn by J. & W. Allen in favor of Vint on John Jett, was delivered to Vint by Allen in part payment of the sum specified in the same receipt, and whether it was paid by Jett or no?

The remaining question for consideration is the claim of the personal representative, widow and heirs of Daniel Sheffey, against the heirs of John and Hannah Allen. The representatives of Sheffey by their cross-bill insist: (1) That they are entitled to the one-fifth of one-eighth of the estate of William King, deceased, in virtue of the reservation made in favor of Daniel Sheffey by the deceased from John Allen and wife to John Vint, of November 16, 1810. (2) That they are entitled to payment of a bond for $600, bearing date January 1, 1811, executed by

John Vint to S. King, and assigned by John Allen to Daniel Sheffey. (3) That they are entitled to payment of the residue of sundry debts, evidenced by a deed of trust executed by John and William Allen to Benjamin Estill, in trust to secure the payment of said debts to Daniel Sheffey, bearing date August 30, 1811. These demands will be severally considered.

1. The deed from John Allen and wife to John Vint, of the 16th November, 1810, contains a reservation in favor of Daniel Sheffey, in the following words: "One-fifth part of the interest of the said John Allen and Hannah, his wife, either as heirs or by purchase from Samuel King, without the specific legacies, being reserved as a compensation to Daniel Sheffey, Esq., for his labor and trouble as counsel employed to recover such part of the estate of William King as shall descend to said John Allen and Hannah, his wife, either as heirs of the said William King or by purchase as aforesaid from Samuel King. The portion of the estate of the said William King hereby intended to be conveyed to the said John Vint being one-eighth part of the estate which may descend to his heirs." I have already stated my opinion to be, that the deed from Allen and wife to Vint was to be construed as conveying the whole of the one-eighth part of the estate of William King which descended to the female grantor, Hannah. The reservation in the deed must, therefore, be held to apply to the one-fifth of the one-eighth of William King's estate, amounting to one-fortieth of the whole estate, which the deed states by way of recital to have been previously purchased by John Allen of Samuel King. No deed from Samuel King to John Allen conveying this fractional interest is produced. The deed from S. King and wife to Vint recited that such conveyance had been made, and those two recitals constitute the only evidence in the cause of its execution. The heirs of S. King and J. Allen are both made defendants in the cross-bill filed by the representatives of Sheffey, and in presenting my view of this cause I shall assume that the first, and all claiming under them, are estopped by the recital in the deed of Samuel King from denying the execution of the recited deed, and that the heirs of Allen are estopped from denying that the reservation in the deed of their ancestor created a trust in favor of Daniel Sheffey, which a court of equity might enforce by compelling a conveyance. This hypothesis is most favorable to Sheffey's representatives, and concedes to them all that has been claimed on their behalf. The trust thus arising presupposes the existence of a contract between Allen and Sheffey as the foundation of the trust; the contract itself is not produced, and the administrator of Sheffey has made affidavit that he has made diligent search for it among the papers of the intestate, but without success. In order to determine the character

of this contract, we must refer to the reservation in the deed from Allen and wife, which I have quoted above. The reservation of the one-fortieth part of the estate is made "as a compensation to Daniel Sheffey, Esq., for his labor and trouble as counsel employed to recover such part of the estate, &c." The clear conclusion deducible from this language is, that a contract had been made between the parties, whereby Allen had stipulated that, in consideration of professional services to be rendered by Sheffey in successfully asserting the title of Allen and wife as heirs-at-law to one-eighth of the estate of William King, the one-fortieth of said estate should enure to the benefit of Sheffey. I say successfully asserting, because unless the effort was successful, the fund or subject from which Sheffey's beneficial interest was to arise would itself fail. The estate, then, must be recovered before any beneficial interest would enure to Sheffey. It presents the common case of a contract between counsel and client for a contingent fee. The consideration of the contract was the recovery, through the learning and ability of the counsel, of the proportionate share of the estate which the law was supposed to have cast by descent upon the wife of the other contracting party, as one of the heirs-at-law of William King. Was the contract performed by Daniel Sheffey? The record of the chancery suit instituted at Staunton, in 1809, by Daniel Sheffey, on behalf of Allen and wife, and of Samuel King, against the personal representatives, widow and the other heirs-at-law of William King, is exhibited as part of the cross-bill filed in this cause by Sheffey's representatives. The bill of the complainants in that suit, drawn by Daniel Sheffey, bears unquestionable evidence of the sagacity, acuteness and learning of that eminent lawyer. It was insisted that the devise to William King, son of James, on condition of his marrying a daughter of William and Rachel Trigg, and in trust for the issue of said marriage, was too remote and uncertain, and therefore void; that the subsequent contingent limitations were also void, for the same reason; and that all the limitations of the will, except those for the benefit of the testator's wife and other specific legatees, having failed, the estate descended to the testator's heirs-at-law, as in cases of intestacy. This construction of the will prevailed with the chancellor, and in 1816 an interlocutory decree was pronounced, declaring "that under existing circumstances, as disclosed in the supplemental bill and answers, the inheritance of the testator's real estate does not pass by said will, but descends to those who are entitled thereto by law." It is a most singular fact, that after obtaining so strong an expression of the chancellor's opinion in favor of the rights of his clients, Mr. Sheffey failed to prosecute the case to a final decree. The last order in the cause was made in 1817, and in 1821 it was struck from the docket, and no subsequent effort was made to have it reinstated. Nor do we find any evidence in the record that Mr. Sheffey ever afterwards appeared as counsel for his original clients. In the action of ejectment subsequently brought, on the law side of this court, by William King, son of James, against Findlay & Mitchell, Mr. Sheffey appeared as counsel for the defendants, who had a common interest with the other heirs-at-law of William King, the elder. The lessor of the plaintiff recovered judgment, and the case was carried by writ of error to the supreme court. Mr. Sheffey argued the cause before that tribunal on behalf of the plaintiffs in error. The supreme court affirmed the judgment of this court, thus deciding that the will of William King the elder invested William King the younger with the legal title to the estate, but expressly waiving the decision of the question whether he took any beneficial interest in it. The original defendants in the action of ejectment applied for and obtained from this court an injunction restraining the lessor of the plaintiff from enforcing his judgment at law. The bill alleged that though the legal title was in William King, he was a naked trustee for the heirs-at-law, and had no beneficial interest in the estate. The other heirs-at-law were made defendants, and partition was prayed among them of the real estate of William King. This bill, too, was drawn by Mr. Sheffey, and its preparation was one of the last acts of his distinguished professional career. It was filed in 1830, and its author died very shortly afterwards. It was strongly insisted by the able counsel for his representatives, in their argument at the bar, that though Mr. Sheffey had abandoned the chancery suit instituted at Staunton for the special benefit of Allen and wife, and of Samuel King, yet that he had by no means abandoned their cause, and that he had as effectually served them in the subsequent suits referred to above, as if he had appeared specially as their counsel; and that as the suit for partition brought by him has resulted in the establishment of their title to partition as heirs-at-law, he has virtually fulfilled his contract with them, and his representatives are entitled to reap the long deferred reward of his services. It is certainly of little consequence in a court of equity, which regards substance rather than form, whether Mr. Sheffey recovered the estate for these clients, in the avowed character of their counsel, or in the character of counsel for other parties having a common interest in them, and standing in the same relation to the subject of partition, provided it was equally his purpose to serve them both. But the record abundantly proves that in abandoning their suit in the state chancery court at Staunton, Mr. Sheffey abandoned, and intended to abandon the cause of his original clients and his contract with them also. He believed that Hannah Allen and Samuel King were unnat-

uralized aliens, and this fact is distinctly avowed in the bill for partition filed by him just before his death! There can be no doubt that Mr. Sheffey died under the firm conviction that no title by descent had been cast upon his former clients in consequence of their alienage, and he avowed that for this reason, their children who were born in Virginia, and not themselves, were heirs at law of William King. They were accordingly made defendants in the suit brought for partition. It was not known till long after Sheffey's death, that the father of Hannah Allen and of Samuel King was a naturalized citizen of the United States; and we have seen that the naturalization of Thomas King operated by virtue of the act of congress of 1802, the naturalization of his minor children who were in the United States when the act of congress took effect. If the title, then, of those children as heirs at law of their half brother William King has at length been established, the result is due to causes other than to the efforts of their former counsel in their behalf. The unfortunate misapprehension under which that counsel labored with regard to the rights of these persons, satisfactorily accounts for his abandonment of their suit, and I am constrained to say that, in my judgment, it is none the less fatal to the pretensions of his representatives that his course was dictated by an ignorance of facts which seems generally to have prevailed, and which was probably shared by the parties most interested in the question.

2. The claim of the representatives of Sheffey to have a decree for satisfaction of the bond for $600, executed by Vint to Samuel King, and assigned by John Allen to Sheffey, may be disposed of in a summary manner. The assignment of the bond constituted Sheffey a mere creditor at large, of Vint. . No judgment was ever obtained or suit prosecuted by Sheffey, either against Vint, the obligor, or Allen, the assignor of the bond. Nor is any sufficient reason assigned for failing to prosecute a suit at law. It is averred in the bill, that after the assignment, Vint being a resident of Tennessee, the bond was sent by Sheffey to an attorney in that state, for the purpose of having it collected, but that Vint being supposed to be insolvent, no suit was ever brought upon it. Without a judgment at law binding the lands of the debtor, equity has no jurisdiction to entertain the bill of a creditor filed to set aside a fraudulent conveyance of the debtor's lands, or to enable the creditor to reach the mere equitable estate of the debtor. The judgment lien is the necessary foundation of the equitable jurisdiction in either case, and equity lends its aid to make that lien effectual whenever it cannot be enforced by execution at law. I will not here examine the cases involving this familiar doctrine, but will content myself with referring to two treatises on equity where the cases are reviewed, and the doctrines of equity on this subject are fully discussed. 2 Rob. Prac. 18, 19, 47, 48; 2 Story, Eq. Jur. § 1216b. It is clear, then, that no decree can be rendered in favor of Sheffey's representatives against the obligor Vint, for the amount of this bond. Nor have they a demand against the representatives of the assignor Allen, which can be asserted here. A brief view of the relation between the assignor and assignee of a chose in action, will make this manifest. The law implies mutual contracts between the parties, from the mere fact of assignment. On the part of the assignee, it implies an engagement to prosecute the demand against the maker or obligor with due diligence, and nothing short of the prompt prosecution of the demand to judgment and execution will, ordinarily, satisfy the requirements of the law so as to give the assignee recourse against the assignor. A suit against the maker is not, indeed, in all cases, a necessary prerequisite to fix the liability of the assignor, as where the maker is notoriously insolvent, and perhaps, too, where he resides beyond the jurisdiction of the courts of the state. Drane v. Scholfield, 6 Leigh, 386. The contract implied on the part of the assignor is, that if the assignee proceeds with due diligence, and yet fails to make the demand against the maker effectual, the assignor will refund to the assignee the price paid for the chose; but even here, the foundation of the assignee's right being but a simple contract, it must be prosecuted within five years, or it will be barred by the statute of limitations. Now, assuming that the notorious insolvency of the obligor Vint, and his residence in another state, were, either of them, sufficient to dispense with the necessity of a suit against him in order to fix the liability of the assignor, the assignee's demand was not prosecuted at law at all, nor here, within the period prescribed by the statute of limitations, which, having been pleaded here, constitutes a bar to a recovery.

3. The claim to satisfaction of the debts due by John Allen to Daniel Sheffey, to secure which, the deed of trust of August 30th, 1811, from John and William Allen, was executed, except so far as they were reduced by the application of the proceeds of sale by the trustee Estill, is liable to the same objection that, with reference to that residuum of debt, Sheffey was a mere creditor at large. The bill is not filed for the purpose of removing obstructions to the title of any property conveyed by that deed, but to enable the plaintiffs to subject the equitable estate of John Allen in a different subject. This claim is deemed invalid for another reason. The deed of trust of August 30th, 1811, was executed, not by John Allen alone, but by John and William Allen jointly, conveying property held jointly by them, to secure the payment of debts due by them jointly. William Allen, or his representatives, are not made parties to this suit. This should have been done for non constat, but that the debts have

been satisfied by him. Waiving, therefore, all objections to this claim arising from the staleness of the demand, I am of opinion that equity has no jurisdiction to grant the relief sought.

Upon the whole case, I am of opinion that the plaintiffs in this cross-bill, the representatives of Sheffey, are not entitled to the relief which they seek, and that their bill be dismissed with costs.

A decree was rendered in conformity with this opinion.